IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN M. MAMROL | : | CIVIL ACTION |
| v. | : **FILED** JUN 09 2008 | |
| MICHAEL J. ASTRUE[1]<br>Commissioner of Social Security | : MICHAEL E. KUNZ, Clerk<br>By: _____ Dep. Clerk | NO. 06-3401 |

MEMORANDUM AND ORDER

**NORMA L. SHAPIRO, S.J.**                                                                 **JUNE 9, 2008**

Plaintiff, Susan M. Mamrol ("Mamrol"), filed an action under 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. Mamrol filed a motion for summary judgment and the Commissioner filed a response to Mamrol's request for review. The matter was referred to the Honorable L. Felipe Restrepo, United States Magistrate Judge, for a Report and Recommendation ("R&R"). The Magistrate Judge recommended denying Mamrol's motion for summary judgment and affirming the final decision of the Commissioner. Mamrol filed objections arguing the Administrative Law Judge ("ALJ") erred because: (1) he failed to obtain the testimony of a medical expert regarding the onset date of her disability; and (2) he rejected the opinion of Mamrol's treating neurologist that Mamrol had disabling multiple sclerosis prior to December 31, 1997, the date she was last insured.

I.      FACTS AND PROCEDURAL HISTORY

Mamrol was born on June 14, 1962. She was thirty-five years old on December 31, 1997,

---

[1] Michael Astrue, the current Commissioner of Social Security, is substituted for Jo Anne B. Barnhart as the defendant in this action under Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g).

the date she was last insured for benefits. She was first diagnosed with multiple sclerosis in September 1998, when she was thirty-six years old. (R. 130.)

The medical record on review begins in late 1996. On November 25, 1996, Dr. Jean Heaney, Mamrol's primary care physician, noted Mamrol may have a cold, and prescribed over-the-counter cold remedies. (R. 100.)

Mamrol testified she did not visit Dr. Heaney from November 1996 through February 1998 because she was busy visiting the pediatrician and gynecologist and "neglected [herself] a little bit." (R. 381-82.)

Mamrol visited Dr. Heaney on February 20, 1998, and Dr. Heaney noted Mamrol had felt dizziness, nausea, hand tingling, and shortness of breath the day before. (R. 99.) Dr. Heaney wrote Mamrol probably had otitis media. (R. 99.) On March 3, 1998, Dr. Heaney wrote that Mamrol's dizziness had resolved. (R. 98.)

On March 19, 1998, Dr. William J. Henry, an ear, nose, and throat specialist, wrote a letter stating Mamrol had a severe upper respiratory infection in December 1997, and in the last month had marked episodes of dizziness. (R. 106.) Dr. Henry stated the dizziness had been resolving over the last several weeks, and all infection had resolved. (R. 106.) He also stated Mamrol had an episode of labyrinthitis, but it appeared to be resolving; he did not recommend further testing. (R. 106.) On August 6, 1998, Dr. Heaney wrote that Mamrol had bilateral conjunctivitis. (R. 97.)

On September 1, 1998, Dr. Michael Cohen wrote a letter describing his neurologic evaluation of Mamrol. (R. 132.) Dr. Cohen stated Mamrol had noticed for the past six months that she had been dragging her right leg; but the leg dragging probably had been occurring for

more than six months. (R. 132.) She had a weak and clumsy right leg, and felt numb around the right ankle and in both hands. (R. 132.) Mamrol also reported an acute onset of vertigo from February through June 1998. (R. 132.) Dr. Cohen suspected the cause of most of Mamrol's symptoms was multiple sclerosis. (R. 132-33.) Dr. Cohen recommended an MRI scan. (R. 133.)

On September 16, 1998, after receiving the results of the MRI scan, Dr. Cohen found Mamrol most likely had early or mild multiple sclerosis. (R. 130.) He noted that Mamrol reported experiencing more disequilibrium, more difficulty walking, increased numbness in her left hand, and more dependency on her glasses since her last visit. (R. 130.) On September 29, 1998, Dr. Cohen's impression of Mamrol was unchanged; he found Mamrol likely had relapsing and remitting multiple sclerosis. (R. 127.)

On October 29, 1998, Dr. Fred D. Lublin examined Mamrol. (R. 139.) On November 11, 1998, Dr. Lublin prescribed Betaseron injections. (R. 217.) In a letter dated November 25, 1998, Dr. Lublin wrote: Mamrol first noted intermittent weakness in the left leg ten years ago; she developed numbness of the left hand seven years ago; around June 1998, she noticed her right leg dragged when she walked distances; and she had fallen a few times. (R. 139.) She reported occasional jerking in her legs and more rarely her hands. (R. 139.) Mamrol had longstanding neck and thoracic spine pain, soreness in the lower spine, and intermittent burning in the ears. (R. 139.) Mamrol also reported a two-day episode of vertigo in February 1998. (R. 139.) Dr. Lublin found that on examination, Mamrol was alert and oriented, her speech was normal, and she had full strength in all extremities. (R. 140.) Dr. Lublin also found Mamrol had equivocal slowing of rapid alternating movements in the right hand, a moderate loss of vibration

3

sense in the legs, and mild ataxia and equivocal difficulty with tandem gait on walking. (R. 140.) Dr. Lublin found Mamrol had multiple sclerosis which may be in secondary progressive form. (R. 140.)

On February 1, 1999, Dr. Lublin found that although Mamrol's condition had been stable for the first several years, she was no longer able to walk; he found it necessary for Mamrol to use a motorized scooter. (R. 211.) On March 21, 1999, Dr. Lublin wrote there was little change in Mamrol's status; Mamrol had been taking Betaseron injections for her multiple sclerosis; her muscle tone was normal; she had full strength in all her extremities; and her gait was mildly spastic. (R. 138.) On July 9, 1999, Dr. Lublin noted little change in Mamrol's condition. (R. 137.) On October 24, 1999, Dr. Lublin found Mamrol's tests of strength and coordination were normal, except for mild ataxia of gait. (R. 136.) On February 15, 2000, Dr. Lublin found Mamrol's multiple sclerosis was stable at the time. (R. 135.)

On May 23, 2000, Dr. Cohen described his neurologic re-evaluation of Mamrol. (R. 122.) Mamrol complained of increased weakness in the right lower extremity; she wore a right brace and walked with a single point cane. (R. 122.) Dr. Cohen's impressions of Mamrol were unchanged except for an additional diagnosis of mild left carpal tunnel syndrome. (R. 122.) On September 18, 2000, Dr. Cohen wrote that Mamrol reported a worsening condition for the last few months; she had more difficulty walking, and her right leg was weaker. (R. 120.) Mamrol had begun to use a scooter when traveling more than two blocks. (R. 120.)

On January 10, 2001, after a neurologic follow-up, Dr. Cohen noted Mamrol had been walking better with her brace, and her fatigue level had improved, but her right leg was still weak and she complained of cramps in the right leg at night. (R. 119.) Dr. Cohen's impression of

Mamrol was unchanged with interval improvement, and Mamrol's prognosis was fair. (R. 119.) On June 4, 2001, Dr. Cohen wrote that Mamrol was doing much better because she was wearing a modified brace, and her fatigue level had improved. (R. 118.) On August 15, 2001, Dr. Cohen found Mamrol was doing much better, her right leg had strengthened, and there was no change in her fatigue level. (R. 117.) On October 8, 2001, Dr. Cohen noted Mamrol's lower back pain had flared up again and Mamrol still had some weakness in the right foot, but found she had definitely improved, and had an improved gait with her new brace. (R. 116.) On December 5, 2001, Dr. Cohen noted Mamrol felt "pretty good" and walked faster and stronger, and there was no change in her fatigue level. (R. 115.)

On May 15, 2002, Dr. Cohen reported Mamrol had fallen three times in the past few months, and there was an intermittent burning sensation in her left shoulder. (R. 114.) Mamrol felt fatigued less often. (R. 114.) On October 16, 2002, Dr. Cohen noted Mamrol had not fallen since her last visit, and the intermittent burning sensation in her left shoulder had improved. (R. 113.) Mamrol was sleeping better and felt less fatigued; she experienced no new symptoms. (R. 113.) Her legs had mild increased tone, but her gait was stiffer than previously. (R. 113.)

On January 6, 2003, Dr. Cohen wrote that Mamrol complained her positional dizziness and vertigo was occurring more often, and she had a headache, pressure in the ears, and nausea. (R. 112.) Mamrol walked very slowly, wore a brace in her right leg, and used a crutch and cane. (R. 112.) She did not sleep well because of lower back pain. (R. 112.) On January 29, 2003, Dr. Thomas P. Leist, Director of the Multiple Sclerosis Center at Jefferson Medical College, conducted a neurologic consultation with Mamrol regarding her multiple sclerosis. (R. 158.) He reported that Mamrol had a long-standing history of multiple sclerosis, and onset most likely

occurred during her teenage years. (R. 158-59.) Dr. Leist also reported that the symptoms had been "relatively shallow," but by age thirty-six, Mamrol was "well into progressive territory." (R. 159.) Dr. Leist noted that over the last few years, progression of Mamrol's right lower extremity weakness continued. (R. 159.)

On February 12, 2003, Dr. Cohen noted Mamrol had fallen since her last visit, but her walking had improved with a new brace. (R. 111.) There was still an intermittent burning in Mamrol's left shoulder, but she was sleeping better and experienced no new symptoms. (R. 111.) Dr. Cohen found Mamrol still had weakness in the right foot, but her gait was better with her new brace. (R. 111.) On September 9, 2003, Dr. Cohen noted Mamrol had fallen twice since the last visit, and the pain in Mamrol's left shoulder and the numbness in her left forearm and hand had exacerbated. (R. 110.) Mamrol noticed her left foot turned inwards, and she had increased balance impairment and slower gait for the last two months. (R. 110.) She used two canes consistently. (R. 110.) She was sleeping better and felt less fatigued. (R. 110.) Dr. Cohen found Mamrol had weakness primarily in the right foot and mild increased tone in both legs. (R. 110.)

On May 24, 2004, Dr. Cohen wrote that Mamrol had blurred vision, was walking more slowly, and had a few falls. (R. 109.) Her positional dizziness and vertigo had subsided recently. (R. 109.) Under the heading "Note to Disability," Dr. Cohen wrote that he reviewed his records, including his initial evaluation of Mamrol, and found it clear that Mamrol's disability dated back well beyond 1997. (R. 109.) Dr. Cohen stated Mamrol's leg dragging dated to 1997 and her episodic vertigo occurred even earlier. (R. 109.)

On July 13, 2004, Dr. Susan V.A. Schweizer, a physical therapist and Mamrol's best

6

friend since high school (R. 400-01.), wrote a letter to support Mamrol's claim that she displayed many signs and symptoms of multiple sclerosis long before she was diagnosed (R. 210.). Dr. Schweizer wrote that in the spring and fall of 1992, Mamrol had experienced extremity numbness or tingling, knee pain with occasional buckling, gross motor clumsiness, and impaired balance. (R. 210.)

On August 12, 2004, Dr. Cohen wrote: Mamrol's condition was unchanged; she could not leave the house in June because her mobility was limited; she was walking more slowly; her lower back pain and headache persisted; and she continued to wear a brace on her right leg and used a crutch and cane. (R. 289.) On October 22, 2004, Dr. Cohen wrote in response to a Social Security Administration questionnaire that Mamrol's symptoms of multiple sclerosis interfered with her ability to work an eight hour day, and her disability was expected to last twelve months or more. (R. 352.)

Mamrol filed an application for disability insurance benefits under title II of the Social Security Act. The Commissioner initially denied the application, and Mamrol requested an administrative hearing. The request was granted. At a hearing, the ALJ heard the testimony of Mamrol and Patricia Scott, a vocational expert. Mamrol was represented by counsel at the hearing.

Mamrol testified she had a husband who worked full-time and three children aged eight, ten, and twelve. (R. 378.) She stated Dr. Heaney had been her primary care physician since 1991 or 1992. (R. 381.) Mamrol testified she saw a chiropractor for years to treat her sore lower back. (R. 382.)

Mamrol testified that in December 1997, she could walk but "still did kind of stumble"

7

and experienced "a little bit of the tripping, the clumsiness, the foot dragging." (R. 383.) She had been clumsy since high school, but her clumsiness and tripping became a daily concern by 1996. (R. 393-95.) She had been fatigued since 1992, when she had her first child, but assumed the fatigue was from parenting. (R. 396.) She testified that in December 1997, her fatigue interfered with her ability to houseclean, and she had to sleep during the day. (R. 383, 387, 396.) She had problems with vertigo. (R. 395.) Since 1997, Mamrol found standing difficult; when she was asked to help the teachers prepare a special luncheon at her son's school, she became dizzy after standing for twenty minutes. (R. 399.) She could walk five or six blocks with a stroller before getting tired. (R. 400.)

She was able to take care of her children, accompany them to the doctor, do laundry, and cook simple meals, but could not go shopping or do other housework. (R. 384-85.) In order to occupy her children, Mamrol would let them watch videos and play while she lay on the couch for hours each day. (R. 397.) Mamrol had to rest before taking her children to the doctor, and sometimes called friends to help her. (R. 397-98.) Mamrol also testified that she cleaned the house, but was very disorganized and paid several people to help her clean. (R. 385.) In 1998, Mamrol saw a physical therapist and an occupational therapist to help her organize.

Mamrol testified she would not have been able to sit at a desk for an eight hour shift in 1997 because she had lower back pain and had to urinate frequently. (R. 400.) She also did not believe she would have been able to perform any job in December 1997 because her handwriting was illegible and she could not type well. (R. 387-88.) Mamrol testified that she had problems with her handwriting since high school because her hand was shaky. (R. 393.) She stated that in the late 1980s, she left the insurance industry because of her cognitive issues. (R. 389.) She

tried returning to her former job as a waitress but it was too physically demanding; in 1992, she tried telemarketing, but she had speech problems and her manager could not understand her handwriting. (R. 389-92.) Later, she tried to be a receptionist, but her handwriting was too poor. (R. 391.)

She testified she began to use a motorized scooter in the spring of 1999, shortly after she was diagnosed with multiple sclerosis. (R. 380.)

Patricia Scott, the vocational expert, testified that Mamrol's work as an insurance agent was skilled and had a light physical demand level. (R. 402-03.) Scott testified that Mamrol's work as a waitress was semi-skilled, light work. (R. 402.) She stated Mamrol's work as a telemarketer was semi-skilled and sedentary. (R. 403.) The ALJ stated he would not consider Mamrol's telemarketing as past relevant work. (R. 404.)

After the hearing, the ALJ found Mamrol had a severe impairment consisting of multiple sclerosis, and she exhibited signs and symptoms of multiple sclerosis at the time of the date last insured, but not to the extent noted by Dr. Cohen in his medical source statement. The ALJ noted there was no evidence Mamrol used a cane as of the date last insured, or that her gait was more than mildly abnormal. The ALJ also observed that as of the date last insured, Mamrol had been caring for her three young children, a more than sedentary activity. The ALJ determined Mamrol's allegations regarding the severity of her symptoms and limitations were only partially credible and not supported by the medical evidence contemporaneous with the date last insured.

The ALJ found that at the time of the date last insured, Mamrol had the residual functional capacity to perform the full range of sedentary level work. The ALJ determined Mamrol was not disabled at any time through the date of the decision, and denied her disability

insurance benefits. The Social Security Appeals Council denied Mamrol's request for review, so the ALJ's decision became the final decision of the Commissioner.

Mamrol filed the current action in federal court. She filed a motion for summary judgment seeking reversal of the Commissioner's decision or, in the alternative, a remand to the Commissioner. The matter was referred to the Magistrate Judge for an R&R. At a hearing before the Magistrate Judge, counsel for Mamrol conceded the evidence was not dispositive of the onset date of Mamrol's disability, but argued that the ALJ should have consulted a medical advisor regarding the onset date before denying benefits. The Magistrate Judge recommended affirming the Commissioner's decision to deny Mamrol benefits. Mamrol filed objections to the Magistrate Judge's R&R.

## II. DISCUSSION

### A. Standard of Review

When a plaintiff objects to portions of a magistrate judge's report and recommendation, a district court must review those portions *de novo*. See 28 U.S.C. § 636(b)(1)(c).

The role of this court on judicial review is to determine whether there is substantial evidence to support the Commissioner's decision. 42 U.S.C. § 405(g); Plummer v. Apfel, 186 F. 3d 422, 427 (3d Cir. 1999). Substantial evidence is more than a mere scintilla but may be somewhat less than a preponderance of the evidence. Boone v. Barnhart, 353 F.3d 203, 205 (3d Cir. 2003). It is "such relevant evidence a reasonable mind might accept as adequate to support a conclusion." Id. It is the responsibility of the ALJ to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. Plummer, 186 F.3d at 429; Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993). Upon appeal to this court, the ALJ's

factual determinations, if supported by substantial evidence, are conclusive even if this court would have decided the factual inquiry differently. See Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001). This standard is set so the appellate court can perform judicial review and, at the same time, avoid undue interference in the Commissioner's administrative functions. Stewart v. Secretary of Health, Educ. and Welfare, 714 F.2d 287, 290 (3d Cir. 1983).

Notwithstanding this deference due to administrative decisions in disability benefit cases, the ALJ must comport with proper procedures and apply proper legal standards. Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984). The ALJ must do more than simply state factual conclusions; he or she must include subsidiary findings to support the ultimate findings. Stewart, 714 F.3d at 290. Additionally, the ALJ must not only communicate the evidence supporting the result, but also provide some indication of the evidence rejected. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).

### B. Statutory and Regulatory Framework

In order to receive Social Security disability insurance benefits, a person must have a disability as defined under the Act, 42 U.S.C. § 423(a)(1)(E), and must have been insured under the Act at the onset of her disability, 20 C.F.R. § 404.131(a). The claimant bears the burden of establishing that she became disabled prior to the date last insured. Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

The Social Security Administration employs a five-step test to determine whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920. At the first step, the Commissioner determines whether the claimant is doing "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If so, the claimant is not disabled and her application is

denied. Id. At the second step, the Commissioner decides if the claimant suffers from a "severe" impairment; if the claimant's impairments are not "severe," then she is denied benefits. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At the third step, the Commissioner determines if the claimant's impairment meets or equals an impairment listed in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If so, the claimant is found disabled. Id.

At the fourth step, the Commissioner finds if the claimant has sufficient residual functional capacity to do her past relevant work; if so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the Commissioner considers the claimant's residual functional capacity, age, education, and work experience, to determine if she can perform other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot make an adjustment to other work, then she is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant bears the burden of proof with respect to the first four steps, then the burden shifts to the Commissioner at step five. Ramirez v. Barnhart, 372 F.3d 546, 550-51 (3d Cir. 2004).

C.   Analysis

The issue before the court is whether substantial evidence supports the ALJ's decision that Mamrol was not disabled prior to her date last insured, December 31, 1997. In her objections to the Magistrate Judge's recommendation that substantial evidence supported the ALJ's decision, Mamrol argues: (1) the ALJ erred in failing to obtain testimony from a medical expert regarding the onset date of Mamrol's disability; and (2) the ALJ erred in rejecting Dr.

Cohen's opinion that Mamrol was disabled prior to December 31, 1997.[2] The court addresses each of these arguments in turn.

### 1. Failure to Call a Medical Expert

Mamrol argues SSR 83-20 required the ALJ to obtain medical expert testimony to determine the onset date of her disability. She contends medical expert testimony is required where the medical evidence contemporaneous with her date last insured was not clearly dispositive and "virtually nonexistent." (Objections 14.)

Social Security Rulings "are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35. Social Security Ruling 83-20 ("SSR 83-20") provides:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process . . .
>
> In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available. When the medical or work evidence is not consistent with the allegation, additional development may be needed to reconcile the discrepancy. However, the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record . . .
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling

---

[2] Mamrol did not object to the Magistrate Judge's determinations that: (1) substantial evidence supported the ALJ's finding that Mamrol's subjective complaints of pain were only partially credible; and (2) the ALJ did not disregard any period of disability based on a subsequent period of remission. There being no objections, the Magistrate Judge's determinations on these two issues will be approved and adopted.

13

level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred . . .

SSR 83-20.

In Walton v. Halter, 243 F.3d 703, 709 (3d Cir. 2001), the court found that where all but one of the medical reports suggested an onset prior to the relevant date, under SSR 83-20, an ALJ must consult a medical advisor rather than rely on lay analysis of the evidence. Id. In Newell v. Comm'r Soc. Sec., 347 F.3d 541, 548-49 (3d Cir. 2003), the court found that where the claimant had to show she was disabled prior to August 31, 1997, but did not seek regular medical treatment from 1990 to 1998 because she was unable to pay, the ALJ should have consulted a medical advisor to help him infer when the claimant's impairments became disabling.

Following Walton and Newell, the Court of Appeals in several non-precedential opinions has found that an ALJ need not consult a medical advisor to determine a claimant's disability onset date if adequate medical records and lay evidence contradict the alleged onset date. See Jakubowski v. Comm'r Soc. Sec., No. 06-1377, 215 Fed. Appx. 104, 108, 2007 WL 62894, at *4 (3d Cir. Jan. 10, 2007) (unpublished) (ALJ not required to consult medical advisor because "[b]y contrast with Newell and Walton . . . the ALJ in this case had access to adequate medical records from the time period before the expiration of [claimant's] insured status, and these records did not support her alleged onset date"); Kelley v. Barnhart, No. 04-3504, 138 Fed. Appx. 505, 509 (3d Cir. July 13, 2005) (not precedential) (ALJ not required to consult medical advisor because "both the objective medical records and lay evidence tend to *disprove* [claimant's] claim of disability prior to June 30, 1984").

Here, unlike in Jakubowski and Kelley, there is little medical evidence contemporaneous with Mamrol's date last insured, December 31, 1997. The medical evidence from the relevant time period was the November, 1996, record from Dr. Heaney stating Mamrol may have a cold, the February, 1998, record from Dr. Heaney stating Mamrol had been dizzy the day before, and the March, 1998, letter from Dr. Henry stating Mamrol had been dizzy over the last month. In finding Mamrol not disabled, the ALJ pointed out that while Mamrol experienced symptoms of multiple sclerosis before the date last insured, there is no contemporaneous evidence her symptoms were debilitating as of that date. But there also is no contemporaneous medical evidence tending to disprove Mamrol's claim that she was disabled as of the date last insured. The advice of a medical advisor would have helped determine when Mamrol became disabled.

The Commissioner argues Mamrol would have visited or complained to her primary care doctor more often prior to her date last insured if her multiple sclerosis had been disabling. The court does not draw inferences from failure to seek medical treatment without first considering the claimant's explanations for her infrequent or irregular medical visits. Newell, 347 F.3d at 547. Mamrol testified she did not visit her primary care doctor more often in the time period contemporaneous with the date last insured because she neglected herself after having children and was too busy visiting the gynecologist and pediatrician. She also testified that she assumed her fatigue was due to parenting, and she had been seeing a chiropractor for years to treat her back pain. These explanations are adequate.

Under Walton and Newell, the ALJ should have consulted a medical advisor to determine whether Mamrol's multiple sclerosis was disabling prior to December 31, 1997. Mamrol's motion for summary judgment will be granted in part and denied in part. The decision of the

Commissioner will not be reversed because, as counsel for Mamrol conceded, there is no clearly dispositive evidence that Mamrol was disabled prior to her date last insured. The action will be remanded to the Commissioner for proceedings consistent with this memorandum.

### 2. Weight Given to Dr. Cohen's Opinion

Mamrol argues: (a) the ALJ improperly substituted his lay opinion for medical expertise by giving too little weight to the reports of Mamrol's treating neurologist, Dr. Cohen; (b) the ALJ failed to recognize that Dr. Cohen's retrospective opinion took into account the progressive nature of multiple sclerosis; and (c) there was no substantial evidence contemporaneous with the date last insured. The Magistrate Judge correctly states it is the function of the ALJ, not the courts, to resolve conflicting evidence by making credibility determinations, see Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981), and the ALJ may find a medical opinion not credible or only partially credible if it is contradicted by medical evidence in the record, see Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). In August, 2004, Dr. Cohen wrote that Mamrol was disabled prior to 1997. The ALJ found Mamrol did not have multiple sclerosis to the extent noted in Dr. Cohen's statement, but has not identified medical evidence in the record contradicting Dr. Cohen's opinion. The medical evidence contemporaneous with the date last insured only fails to support Dr. Cohen's opinion, and does not provide a sufficient basis for rejecting Dr. Cohen's retrospective assessment. Because the court will remand this action to the Commissioner for further proceedings, the Commissioner will have the opportunity to determine Dr. Cohen's credibility in light of a more complete record.

### III. CONCLUSION

The Magistrate Judge's recommendations that substantial evidence supported the ALJ's

finding regarding Mamrol's subjective complaints of pain, and the ALJ did not disregard any period of disability based on a subsequent period of remission, will be approved and adopted. The recommendations that the ALJ was not required to consult a medical advisor and that the AlJ gave appropriate weight to Dr. Cohen's retrospective opinion will neither be approved nor adopted. Mamrol's motion for summary judgment will be granted in part and denied in part. This action will be remanded to the Commissioner for further proceedings consistent with this memorandum.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN M. MAMROL | : | CIVIL ACTION |
| v. | : | |
| MICHAEL J. ASTRUE<br>Commissioner of Social Security | : | NO. 06-3401 |



FILED
JUN 09 2008
MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

ORDER

AND NOW, this 9th day of June, 2008, upon consideration of plaintiff's motion for summary judgment, the Report and Recommendation of the Honorable L. Felipe Restrepo, United States Magistrate Judge, plaintiff's objections, defendant's reply, and all other relevant papers in the record, for the reasons set forth in the accompanying memorandum, it is **ORDERED** that:

1. Plaintiff's motion for summary judgment (paper no. 8) is **GRANTED in part** and **DENIED in part**.

2. The Report and Recommendation (paper no. 15) is **APPROVED AND ADOPTED in part** and **NEITHER APPROVED NOR ADOPTED in part**:
   a. The Recommendation that substantial evidence supported the finding that plaintiff's subjective complaints of pain were only partially credible is **APPROVED AND ADOPTED**.
   b. The Recommendation that the Administrative Law Judge did not disregard any period of disability based on a subsequent period of remission is **APPROVED AND ADOPTED**.
   c. The Recommendation that it was not necessary for the Administrative Law Judge to consult a medical advisor is **NEITHER APPROVED NOR ADOPTED**.
   d. The Recommendation that the Administrative Law Judge gave appropriate weight to Dr. Cohen's opinion is **NEITHER APPROVED NOR ADOPTED**.

3. This action is **REMANDED** for further proceedings consistent with the memorandum filed this date.

_____
Norma L. Shapiro, S.J.